**In re CHARTER GRAPHIC SERVICES, INC., Debtor.**

**Jesse C. Bannistor, et al., Plaintiffs,**

**v.**

**Colotone, Inc., et al., Defendants.**

**Bankruptcy No. 396–30620–SAF–11. Adversary No. 396–3362.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

May 6, 1998.

Sharla Myers, Kyle & Mathis, Bruce W. Bowman, Jr., Vial, Hamilton, Koch & Knox, Dallas, TX, for plaintiffs.

G. Michael Curran, David F. Staber, Akin, Gump, Strauss, et al., John E. Leslie, Dallas, TX, for defendants.

## *MEMORANDUM OPINION AND ORDER*

STEVEN A. FELSENTHAL, Bankruptcy Judge.

Former employees of Charter Graphic Services, Inc., the debtor, seek to recover unpaid employee benefits from the defendants. While basically conceding that the employee benefits have not been paid, the defendants contend they have no liability to the former employees.

The court conducted a trial of this matter on January 20–23, February 9–10, February 13 and February 17, 1998. The plaintiffs' third amended complaint raises a non-core matter. The parties have not expressly consented to the entry of a final order by this court. 28 U.S.C. § 157(c). This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

The court adopts as its findings of fact the parties' stipulation of undisputed facts contained on page 6 of the joint pretrial order and the additional stipulation presented during trial and filed April 1, 1998.

Bankers Trust New York Corporation operates its $750 million private equity investment business through BT Capital Partners, Inc., a Delaware corporation, and BT Investment Partners, Inc. BT Investment Partners manages Bankers Trust's business of investing Bankers Trust New York Corporation's capital in private securities, thereby producing an inventory of portfolio companies. Without recounting bank holding company and federally insured bank regulatory schemes, the court notes that Bankers Trust could not directly own a controlling interest in private corporations. Rather, the investments had to be made through qualified investment corporations. BT Investment Partners advanced funds to Pyramid Ventures, Inc., a Delaware corporation, to invest in the acquisition of what became Charter Graphic Services, Inc., a graphic art business. Pyramid incorporated Sphinx Graphics Ventures, Inc., a Delaware corporation. Pyramid invested capital in Sphinx for the acquisition of Colotone, Inc., and its subsidiaries. Sphinx owns one hundred percent of the stock of Colotone, Inc.

Colotone, Inc., owns all the stock of Colotone Riverside, Inc. Colotone Riverside, Inc., with a loan from Gibraltar Corporation of America and one million dollars of capital from the Bankers Trust private equity investment system, acquired the assets of Riverside Printing, a Dallas graphic art business. Colotone Riverside, Inc., changed its name to Charter Graphic Services, Inc. Colotone, Inc., also acquired Colotone Imaging, a Connecticut operation.

James Dworkin, a lawyer by training but a financial manager by experience, is an employee and vice president of BT Capital Partners, Inc. As Dworkin testified, the structure typified the manner in which Bankers Trust invested capital in private equity transactions. The precise legal structure was established after a due diligence analysis, advice of counsel and decision to invest. But, ultimately, the legal structure of the corporate entities implements the economic reality of a vehicle for a Bankers Trust private equity capital investment.

Bankers Trust, through Pyramid, invested an additional $800,000 in January 1995 and later a further $770,000 for the debtor's operations.

In addition to his position with BT Capital Partners, Inc., Dworkin sat on the board of directors of Charter Graphic and participated in its management committee meetings. He monitored Bankers Trust's investment in Colotone and its subsidiaries, including the debtor. He served on the Sphinx board of directors. He served as the financial and business advisor to Pyramid, and as Pyramid's agent. In these positions, Dworkin negotiated the Gibraltar transaction on behalf of Sphinx, Pyramid and individual investors.

Corporations act through individuals. *See, e.g., United States v. Dotterweich*, 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943). On behalf of BT Investment Partners, Dworkin executed the Gibraltar term sheet letter for the purchase of the Colotone stock. The Gibraltar transaction required, in part, that Charter Graphic operate under a "lockbox" arrangement with Gibraltar. Gibraltar received Charter Graphic's income, which it applied to the debt. Charter Graphic then requested advances from Gibraltar to fund its operations. Dworkin signed the Colotone Riverside, Inc., notes to Gibraltar on behalf of the corporation. He signed the financial agreement for the corporation as well as other loan documents. He executed these documents as assistant corporate secretary. He consulted with the law firm who conducted the due diligence analysis at the time of the investment and acquisition. The same law firm represented all the Bankers Trust entities in the investment and the debtor. Not only did Dworkin negotiate the loan and investment transaction on behalf of the Bankers Trust investors, but he was the point person for the decision to make further investments in the debtor. And, ultimately, Dworkin communicated the Bankers Trust decision to Gibraltar that the Bankers Trust entities would no longer invest in the debtor, resulting in the collateral being placed in the possession of Gibraltar. He participated in and communicated that decision without a prior authorizing resolution of the debtor's board of directors and without a directive from the debtor's chief executive officer.

For purposes of the equity capital investment by Bankers Trust in the debtor, Dworkin, as agent, and Sphinx, Pyramid, BT Investment Partners, BT Capital Partners, Inc., and Bankers Trust New York Corporation acted as one economic entity. Documents at times referred to the various Bankers Trust entities as the Bankers Trust private equity group. As he testified, Dworkin acted on behalf of the investors, the shareholders, and in that capacity, Bankers Trust private equity group controlled the investment decision, they negotiated the loan transaction with Gibraltar, they agreed to a loan structure that permitted employee income to be taken from the employees for employee benefit plans but delivered to the control of the secured creditor for payment on a secured debt. They ultimately controlled the decision to permit the secured creditor to take control of its collateral even though employee benefit plan assets were swept in the process.

Gary Ullman was the president and chief executive officer of Charter Graphic from June 1995 until January 1996. BT Investment Partners recommended that the Colotone companies retain Ullman. BT Investment Partners represented that it hired Ullman. Ullman represented to third persons that he had been retained by Bankers Trust. Dworkin never advised third persons that Ullman's representations were not correct. Harvey Mackler of Gibraltar also understood that Bankers Trust hired Ullman. Ullman was never placed on the Charter Graphic payroll but rather was paid as a consultant. Ullman represented or suggested to Charter Graphic's employees that he had been retained by Bankers Trust and that Bankers Trust stood behind the debtor's operations. Ullman was responsible for the daily operations of the debtor.

Tom Villano was the chief financial officer of Charter Graphic from September 1995 until confirmation of Charter Graphic's plan of reorganization under Chapter 11 of the Bankruptcy Code. However, he was never employed by Charter Graphic. Rather, he

was employed by Colotone, Inc., in Connecticut. He worked in Dallas at Ullman's request.

The payroll system for the Charter Graphic employees pre-dated the acquisition by Colotone, Inc. Charter Graphic merely continued the payroll system. However, the debtor's cash flow was altered by the requirements of the Gibraltar loan, negotiated by Dworkin on behalf of the Bankers Trust investors. Colotone, Inc., offered the employees of Charter Graphic a 401(k) retirement plan. Charter Graphic offered its employees a healthcare plan. The healthcare plan was self-insured and administered by a third party administrator. The employees paid an insurance premium. The employees also made contributions to the 401(k) plan.

Employee healthcare and 401(k) plan payments were deducted from their paychecks. However, the contributions were not deposited in the respective plans upon payroll deduction. Rather, all of the debtor's income, including, in effect, the employee's withheld income, was paid to Gibraltar. Gibraltar in turn advanced funds to the debtor to pay operations. Upon the advance, Charter Graphic would transfer funds to the 401(k) plan. Plan funds deducted from employee paychecks were not deposited into a trust account. Rather, loan advances some 15 to 30 days later were used to fund the plan. A separate trust fund for the health insurance plan was never maintained.

Ullman, as the debtor's president and chief executive officer, and Villano, as its chief financial officer, had corporate responsibility for depositing deductions from employees' paychecks into trust accounts on an ongoing basis. But Dworkin, on behalf of the Bankers Trust investment entities, negotiated a loan structure that turned control of plan assets upon deduction from employees' paychecks to Gibraltar rather than to the plans. Dworkin acted on behalf of Bankers Trust.

In December 1995 Charter Graphic could not meet its payroll. Pyramid, as the Bankers Trust entity capable of investing Bankers Trust capital in private corporations, determined that it would make no further investment in the debtor through its Sphinx entity. The debtor was in non-monetary default on its loan covenants with Gibraltar. Dworkin informed Gibraltar that the Bankers Trust entities would not make any additional investment in the debtor. Mackler testified that Dworkin gave Gibraltar "the keys." Gibraltar acted to obtain control and possession of its collateral.

In December 1995 Gibraltar reviewed and approved certain requests while advancing funds to the debtor. Villano contended that Gibraltar did not advance sufficient funds to cover all employee benefit obligations. Dworkin, recognizing Bankers Trust's responsibility for the structure of the loan transaction and its impact on the employees, directed Villano to take all appropriate steps to protect the employees. Villano testified that he requested Gibraltar fund the payroll in full, including the plan assets deducted from the employees' paychecks. Ullman, Villano and Dworkin discussed a budget with Mackler, but Mackler testified that Gibraltar loaned based on accounts receivable, not on an itemized basis. Gibraltar advanced over $300,000 to the debtor in mid to late December 1995. The debtor did not deposit sufficient funds in the 401(k) plan or set aside funds for the healthcare plan to cover the payroll deduction for those plans. The debtor did, however, pay Ullman $50,000.

Yet, in December 1995, several of the employees had salary withheld for contribution to the 401(k) plan. Their withheld salary also went to Gibraltar. Several of the employees also participated in the unwritten health benefits plan. They had salary withheld for the employee portion of the health care plan. Their withheld salary also went to Gibraltar. Gibraltar has settled with these employees. But the employees have not been made whole. They have not recovered all of their withheld salary for their 401(k) plan nor have they recovered all their medical claims incurred while they contributed their salary to the health plan. Although unable to reach a settlement, according to Dworkin, Bankers Trust's "heart is in the right place."

The employees seek a restitution of their plan benefits. The parties stipulate that the 401(k) plan amount is approximately $30,000.

The total medical claims that should have been covered by the premium deducted from the employees' pay is approximately $176,000.

## Evidentiary Issues

The court addresses several outstanding evidentiary issues.

■ The defendants objected to plaintiffs' exhibits 28, 124, 141, 1237 and 1239. The defendants argued the documents were not properly authenticated and therefore should not be admitted. The plaintiffs must only establish "a prima facie showing of authenticity" for the exhibits to be admitted. *E.W. French & Sons Inc. v. General Portland, Inc.*, 885 F.2d 1392, 1398 (9th Cir.1989). The Federal Rules of Evidence state "[t]he requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).

■ Exhibits 28, 124, and 141 were produced from Pyramid's files by Dworkin in response to discovery requests. No one asserts the documents are forgeries or were surreptitiously placed in Dworkin's or Pyramid's files. Dworkin stated the documents are of a kind he would have kept. "The fact that documents were found in defendant's possession is enough to authenticate them." *Federal Trade Commission v. Hughes,* 710 F.Supp. 1520, 1522 (N.D.Tex.1989). The fact that Dworkin does not refute that the documents are from Pyramid's records also strongly supports admissibility. *See Snyder v. Whittaker Corp.,* 839 F.2d 1085, 1089 (5th Cir.1988). Although these documents do not bear signatures and do not appear on official letterhead, "the only logical explanation of their appearance in [Dworkin's or Pyramid's] files if they are not authentic, is that the documents are forgeries, or spurious. Such an explanation is rejected as entirely improbable." *U.S. v. Imperial Chem. Indus.,* 100 F.Supp. 504, 513 (S.D.N.Y.1951).

Plaintiffs' exhibit 1237 appears to be a receipt from a doctor's appointment. The exhibit has the doctor's name and address pre-printed on the bottom. The patient's name and address (a plaintiff in this suit) is typed on the top of the exhibit. No one argued exhibit 1237 was anything other than a receipt for medical services. The exhibit is sufficiently authenticated.

Plaintiffs' exhibit 1239 appears to be receipts for prescription medications. They have the address and phone number of the pharmacy. They also have the name, address and phone number of the patient (a plaintiff in this suit). No one argued exhibit 1239 was anything other than receipts for prescription medications. The exhibit is sufficiently authenticated.

■ Plaintiffs' exhibits 28, 124, 141, 1237 and 1239 are all sufficiently authenticated to be admitted. Any uncertainty as to the authentication of the documents will go to the weight to be given the documents. *Imperial Chem.,* 100 F.Supp. at 513.

## ERISA

■ The plaintiffs contend that the defendants breached their fiduciary duty to protect participants in employee benefit plans. Under the Employee Retirement Income Security Program (ERISA),

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary ... responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(B).

■ The term "fiduciary" under ERISA must be liberally construed to effectuate the remedial purpose of the statute. *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assur. Soc. of U.S.,* 841 F.2d 658, 662 (5th Cir.1988).

> ERISA was enacted to improve the fairness and effectiveness of qualified retirement plans in their vital role of providing retirement income. One of the many concerns leading up to the enactment of ERISA was the misuse of pension funds and the resulting loss of benefits enured to the employees/beneficiaries of these retire-

ment plans. The misuse of employee retirement plans is well documented and provided the impetus for the enactment of ERISA.

*Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir.1995) (internal citations and quotations omitted).

ERISA's preemption clause dictates that ERISA shall supersede any state causes of action insofar as they may now or hereafter relate to any employee benefit plan. The federal courts have broadly construed the deliberately expansive language of the ERISA preemption clause. A state cause of action relates to an employee benefit plan whenever it has a connection with or reference to such a plan. If a state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan, then the claim falls in the province of the federal courts.

*Dowden v. Blue Cross and Blue Shield of Texas, Inc.*, 126 F.3d 641, 643 (5th Cir.1997) (internal citations and quotations omitted). Consequently, Congress enacted a standard for a fiduciary with the details to be developed by the courts in light of the special nature and purpose of the employee benefit plans. *Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1523 (10th Cir.1997).

Charter Graphic maintained a self-insured employee health benefit plan and Colotone, Inc., maintained a 401(k) plan for the Charter Graphic employees. Under ERISA, both required plan assets to be held in trust. 29 U.S.C. § 1103(a). Employee funds deducted from employees' salaries should have been placed directly into trust accounts. The debtor did not do that. Rather, employee contributions to the plans were commingled with Charter Graphic's general revenue and used to pay the secured debt at Gibraltar. The debtor would then have to borrow money from Gibraltar to fund the plans. This practice on its face breached the fiduciary duty owed to the plaintiffs. Additionally, except under limited circumstances not relevant here, ERISA states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants

in the plan and their beneficiaries..." 29 U.S.C. § 1103(c)(1). The plan assets benefitted Charter Graphic when they were paid directly to Gibraltar on a loan obligation, thereby violating the explicit language of 29 U.S.C. § 1103(c)(1).

Bankers Trust's private equity investment entities, Bankers Trust New York Corporation, BT Capital Partners, BT Investment Partners, Pyramid and Sphinx, acting through their agent Dworkin, and with the advice of counsel representing all the Bankers Trust entities in the transaction, negotiated, executed and implemented the loan arrangement with Gibraltar. They had sufficient control over the assets deducted from employees' salaries to enter the loan arrangement with Gibraltar and caused the loan arrangement to be implemented. They therefore had control over plan assets. They caused the plan assets deducted from the employees' salary to be delivered to Gibraltar rather than into a trust account. And, ultimately, they authorized Gibraltar to take control over the assets.

In December 1995 Dworkin communicated the Bankers Trust decision to no longer invest in Charter Graphic. On behalf of Bankers Trust, and without prior consultation with or approval by his fellow members of the Charter Graphic board of directors, Dworkin informed Gibraltar that Gibraltar could take whatever actions were necessary to protect its collateral. Mackler testified that Dworkin gave Gibraltar "the keys." Gibraltar summoned Charter Graphic personnel to New York to discuss the situation. Dworkin attended the meeting as did Ullman and Villano. Ullman and Mackler both attempted to sell the company, but were unsuccessful. From mid-December until Charter Graphic closed its doors on January 4, 1996, Gibraltar controlled the company and its assets as well as plan assets. Dworkin's actions on behalf of Bankers Trust allowed that to occur.

Dworkin on behalf of the Bankers Trust entities communicated the decision to Gibraltar that Bankers Trust would no longer invest in the debtor. Dworkin then effectively authorized Gibraltar to take control of the debtor's assets pledged to Gibraltar. Dwor-

kin, on behalf of the Bankers Trust investment entities, had sufficient discretionary control over the assets to communicate and implement that decision. Because plan assets deducted from employee salaries were not deposited into a trust account, Dworkin's actions on behalf of the Bankers Trust entities also included an exercise of control over those plan assets. The Bankers Trust entities for all practical purposes caused those plan assets to be transferred to Gibraltar. The Bankers Trust entities had sufficient control to so act without prior approval or authorization by the debtor. Indeed, only after the fact, on December 28, 1995, did Villano sign a surrender letter on behalf of the debtor. The debtor's board of directors did not even meet to ratify the action until January 2, 1996. Counsel representing the Bankers Trust entities and the debtor advised Dworkin and the Bankers Trust entities on the surrender of collateral. The Bankers Trust entities thus exercised control over the plan assets transferred to Gibraltar rather than into the mandatory trust accounts.

Dan Smith testified Dworkin just relinquished control to Gibraltar.

These actions establish that Dworkin had ultimate discretionary authority and control over the plan assets. He knew or should have known by his due diligence and consultation with counsel, that employees contributed to ERISA plans. Deductions for 401(k) contributions and health care benefit premiums became trust assets. Dworkin negotiated and executed the loan arrangement with Gibraltar that transferred plan assets to Gibraltar to pay secured debt rather than to fund the trusts. And, when the company ultimately failed, he effectively placed the secured creditor in possession of the December 1995 ERISA contributions. He could act without prior Charter Graphic board of directors' approval. Thus, he had authority and control over plan assets.

Ullman and Villano assumed their positions with Charter Graphic when this system had already been established by Bankers Trust and Gibraltar. Ullman and Villano knew about the system. They knew or should have known that statutorily-imposed trust assets were being used to pay secured debt rather than being deposited in trust accounts. Neither took any formal actions to alter that arrangement, although in December Villano had discussions with Gibraltar to attempt to borrow a sufficient amount to fund the final obligations. Gibraltar claims that it advanced sufficient funds. Although both had corporate responsibility to act to correct the breach, the system pre-dated their assignment to Charter Graphic.

The failure to deposit plan assets into a trust account, the use of trust assets to pay secured debt, and the failure to remedy the situation in December 1995 each amount to a breach of a fiduciary duty.

A writing reflecting the complete health plan was never presented at trial. Employees did have a summary of benefits provided at one time. For almost all of the relevant period, all parties functioned as though there was a plan. There is sufficient evidence for the court to find there was a plan subject to ERISA.

As found below, Ullman as chief executive officer and Villano as chief financial officer served as plan administrators. In that capacity, they each had a fiduciary duty to the plan beneficiaries. 29 U.S.C. § 1002(21)(A)(iii). They breached that duty by failing to cause payroll deductions for plan contributions to be deposited into trust accounts. They further breached that duty by failing to issue a written health plan.

Bankers Trust argues that finding its entities have liability will chill investments. Congress recognized through ERISA that the public good would be furthered by protecting employees by imposing fiduciary responsibilities on those controlling benefit plan assets. Sensitivity to the goals of Congress and ERISA should have no adverse effect on capital and equity investments. During the years this suit has been pending, Bankers Trust reports earnings of $766 million on revenue of $5.17 billion in 1996 and earnings of $866 million on revenue of $6.22 billion in 1997. Timothy O'Brien, *Bankers Trust Profit Up 12.5% in Quarter*, New York Times, January 23, 1998, C2. In addition, Bankers Trust has substantial ERISA expe-

rience. Bankers Trust, as much as any financial institution in the United States, has the sophistication and knowledge to negotiate an investment and loan transaction in such a way that assures that employee benefit plan payments are placed into a trust account and managed for the beneficiaries, rather than delivered to a secured creditor to pay corporate debt. Bankers Trust need only inform a lender that the loan transaction must respect employee benefit plan fiduciary obligations. That is not an earth-shattering concept likely to disrupt the investment markets.

Furthermore, an investment by Bankers Trust held the prospect of continued employment for the debtor's employees. But the employees, like Bankers Trust, understood that the debtor faced financial hard times requiring a dedicated turnaround effort. As they performed their functions, they had appropriately trusted persons in control of plan assets to deposit plan assets withheld from their salary into the appropriate trust accounts. An application of ERISA that assures that persons who exercise control over plan assets act to protect those assets will enhance not detract from the operation of the economy.

Bankers Trust contends that a finding of a breach of a fiduciary duty could nevertheless adversely impact the small entrepreneur. An individual owner of a closely held corporation who controls employee benefit plan assets may indeed be subject to ERISA's fiduciary duty. But ERISA protects against the possibility that the employee's expectations of plan benefits would be defeated through poor management by the plan administrator. The employer protects himself by naming a plan administrator. Protection of employees' benefits in small businesses fosters small business opportunity to obtain and retain employees.

### Agents

■ The plaintiffs maintain that Dworkin, Ullman and Villano acted as agents for Bankers Trust investment entities. An agency is created by an express or implied agreement or by operation of law whereby the agent acts on behalf of the principal, subject to the principal's control. *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1296 (5th Cir.1994). Under Texas law, the court must find that the principal had the right to control the means and the details of the process by which the agent acted. *Id.* The court must determine the extent of an agent's authority from all the surrounding circumstances. 39 F.3d at 1297.

Bankers Trust acting through its private investment corporations decided to invest in the Charter Graphic assets by purchasing the stock of Colotone, Inc., and then causing Colotone, Inc., to purchase the Charter Graphic assets. BT Investment Partners charged Dworkin with the primary responsibility for the transaction. He consulted with the law firm hired by Bankers Trust to conduct the due diligence analysis. He negotiated on behalf of the Bankers Trust entities with Gibraltar and signed the term sheet for BT Investment Partners. He served as an advisor to Pyramid which Bankers Trust used as the entity to advance the investment dollars to Sphinx which in turn made the investment. He sat on the Sphinx board and for a period of time was the sole board member. He then executed the loan agreement as corporate officer. And, then, as the operations evolved, he represented the Bankers Trust entities as the investor on the debtor's board of directors and on the operating committee. He communicated the Bankers Trust decisions regarding further investments. He oversaw for Bankers Trust Ullman's turnaround efforts. He consulted for the Bankers Trust entities with Gibraltar. And, in the end, he communicated the Bankers Trust entities' decision to Gibraltar which permitted Gibraltar to take possession of the debtor's assets. Dworkin acted as agent for Bankers Trust and its private investment entities involved in this transaction.

■ Ullman meanwhile held himself out to employees and third persons doing business with the debtor as Bankers Trust's agent.[1] BT Investment Partners decided to

---

1. The plaintiffs presented several letters with Ullman's signature. Ullman claims the letters were never sent. Ullman's secretary, Carol Little, testified they were sent. Ullman's testimony is not credible. Plaintiffs' exhibit 838 is a letter dated June 13, 1995, addressed to Dale Terry. The

make Ullman the chief executive officer of the debtor. Mackler understood that Bankers Trust hired Ullman. Ullman requested that Villano provide services to the debtor. Although Villano remained on the Colotone Imaging payroll in Connecticut, he provided financial services to the debtor in Dallas. To the extent that either could be deemed to have control over plan assets as distinguished from being plan administrators, they acted as Bankers Trust agents.

Dworkin's actions regarding the discretionary authority and control over plan assets was exercised on behalf of the principal, Bankers Trust and its investment entities. Bankers Trust and the Bankers Trust investment entities are thus liable for the breach of the fiduciary duty.

### Corporate Liability

■ The court must recognize the separate legal existence of the Bankers Trust corporate defendants in this case, except to the extent a corporation is acting as a conduit or agent of another corporation. *Matter of Sims,* 994 F.2d 210, 218 (5th Cir.1993). The federal banking regulatory scheme forces Bankers Trust New York Corporation to only make private equity investments through a system of subsidiary corporations. As Dworkin testified, Bankers Trust accomplished its private equity investment in this case through the chain of the corporate defendants. Each corporation acted to further the private equity investment, ultimately for Bankers Trust New York Corporation.

Dworkin, as agent, testified that he acted for the investors in Charter Graphic but often he could not tell for which Bankers Trust entity he actually rendered specific services. He acted for the persons in charge of the investment decisions irrespective of corporate entity or form. He sought to protect Bankers Trust's investment irrespective of the corporate forms. Indeed, significant portions of the corporate structure for the investment was created after the investment decision. Ullman represented to third persons doing business with Charter Graphic that he acted for Bankers Trust. Villano assumed his position with the debtor while employed by another Bankers Trust-owned entity.

■ As discussed above, ERISA preempted state law for the broad remedial purpose of protecting plan assets accumulated to finance employee benefits. Congress thereby established a fiduciary duty to ensure that employee contributions to benefit plans would not be diverted for other uses. The fiduciary duty imposed by this comprehensive legislation must be exercised by all persons in control of plan assets. ERISA's broad approach to fiduciary function must cut across corporate structures to the extent necessary to accomplish the act's purpose.

■ To accomplish its private investment purpose in this case, the Bankers Trust entities, each on behalf of its parent corporation, acting through its agents, structured the investment and loan transaction by effectively exercising control over plan assets. Each must be deemed a conduit or agent for purposes of this case to assure that the ERISA purpose in applying the broad remedial fiduciary charge for employee benefit plans is not frustrated or circumvented. Therefore, each of the Bankers Trust corporate defendants must be held liable for the fiduciary breach. To hold otherwise would immunize Bankers Trust New York Corporation and its private investment entities, frustrating ERISA's purpose and, here, harming the employees who entrusted portions of their salaries to those persons in control of the plan assets.

exhibit states "I have been hired by Bankers Trust New York, the majority owners of Colotone Riverside. Two weeks ago I became C.E.O. of this operation." Plaintiffs' exhibits 546 and 734 are both dated June 14, 1995, and are otherwise the same except for the person the letter is addressed to, Charles Clark and Alton Williams respectively. The letters state "I have been hired by Bankers Trust, New York—the majority shareholder of Colotone Riverside, Dallas, Texas, and I report directly to the President of Bankers Trust—one of the largest banks in North America." Plaintiffs' exhibit 378 is a letter dated July 21, 1995, addressed to Joe Polanco. The letter states "My name is Gary Ullman, the new C.E.O. of Colotone Riverside effective seven (7) weeks ago. My last role before joining Bankers Trust was running a one-billion dollar company." The plaintiffs presented sufficient evidence that Ullman held himself out as an agent of Bankers Trust. There are also several documents in plaintiffs' exhibit 99 with similar statements.

## Damages

■ The plaintiffs listed on Exhibit "B" to the additional stipulation of facts submitted during the trial and filed on April 1, 1998, and the "additions to Exhibit 'B' " were participants in the 401(k) plan. The column labeled "MTD 401(k)" on Exhibit B and under amount of 401(k) claim on the addendum reflect the amounts withheld from their paychecks for 401(k) contributions which were not deposited in the trust for the 401(k) plan. They are entitled to recover those amounts as damages.

The plaintiffs listed in paragraphs 9–14 of the additional stipulation of facts presented at trial and filed on April 1, 1998, were participants in the health plan. They all had premiums withheld from their paychecks to cover health claims to January 4, 1996. They are entitled to recover the health claims incurred prior to January 4, 1996, as designated in paragraphs 9–14.

A copy of the additional stipulations filed April 1, 1998, is attached.

## Attorneys' Fees

■ Under ERISA, "the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The court should consider:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fee sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' position.

*Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980). No one factor is dispositive, rather, the court should weigh the factors in determining whether to award fees. *Id.*

■ Should the court determine to award attorneys' fees, the court must utilize the lodestar analysis to determine the amount of the fees. *Wegner v. Standard Insurance Co.,* 129 F.3d 814, 822 (5th Cir.1997).

To determine reasonable compensation, the court must determine the "nature and extent of the services supplied by" the attorneys. *Matter of First Colonial Corp. of America,* 544 F.2d 1291, 1299 (5th Cir.), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). The court must also assess the value of the services. These two factors comprise the components for the lodestar calculation. *See Cobb v. Miller,* 818 F.2d 1227, 1231 (5th Cir.1987). Generally, the lodestar is calculated by multiplying the number of hours reasonably expended by reasonable hourly rates. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The court may then adjust the compensation based on the *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974), factors. *Blanchard v. Bergeron,* 489 U.S. 87, 91–92, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). The *Johnson* factors may be relevant for adjusting the lodestar calculation but no one factor can substitute for the lodestar. *Id.* Rather, the lodestar shall be presumed to establish a reasonable fee with adjustments made when required by specific evidence. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 554–55, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

■ The attorneys have the burden to show that their requested compensation is reasonable and was necessary. *In re Beverly Manufacturing Corp.,* 841 F.2d 365, 371 (11th Cir.1988). To assist the court in determining the reasonableness of the requested fees, the attorneys are ethically obligated to exercise reasonable billing judgment. They must make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise not necessary. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.

■ The defendants did not act in bad faith. Rather, the Bankers Trust entities and Dworkin merely lost sight of their ERISA obligations when they structured the Bankers Trust investment and loan package with Gibraltar and, later, when they surrendered the collateral. But these individual plaintiffs were left without full trust account

deposits and without a means to recover their plan investments from the debtor. Bankers Trust and its investment entities are culpable for structuring an operation that permitted that to occur. An attorneys' fee award should remind investors who structure transactions with assets pledged to secured creditors to be mindful of the fiduciary obligations under ERISA.

The plaintiffs filed this adversary proceeding in 1996. In 1996, Bankers Trust New York Corporation earned $766 million on revenue of $5.17 billion. In 1997 Bankers Trust New York Corporation earned $866 million on revenue of $6.22 billion. *New York Times, supra.* Bankers Trust can satisfy an award of attorneys' fees. Ullman and Villano cannot. The individual plaintiffs cannot.

During the trial, before the parties entered their stipulation of damages, several plaintiffs had been called to testify. With the exception of one, all had to take leave without pay from their jobs to testify. Yet each had relatively small amounts at stake, although to each plaintiff, the amount was significant. They could not afford the loss of salary much less the attorneys' fees necessary to litigate this complaint.

Since Bankers Trust or its agent in effect delivered funds withheld from these plaintiffs' salary for ERISA plans to the secured creditor rather than to a plan trust account, Bankers Trust and its investment entities should bear the cost of this litigation, even though the attorneys do not represent all the plan participants or beneficiaries.

The court therefore finds that the factors weigh in favor of awarding the plaintiffs' attorneys' fees and cost of litigation from the Bankers Trust entities.

■ Turning to the lodestar analysis, the court first addresses the hourly rate. The defendants stipulate that the plaintiffs' attorneys' hourly rates are within the prevailing standards in the community. *Missouri v. Jenkins,* 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). However, Sharla Myers testified that her hourly rate increased from $170 to $180 during the course of the litigation, but she submitted calculations based on $180 per hour. The court

accordingly applies a blended rate of $175 per hour for her work. Several paralegal rates, however, exceed the hourly rates customarily awarded by this court. Although paralegal rates in the community may have increased since the court last considered its operating assumptions, counsel for the plaintiffs did not present evidence concerning the prevailing rates for these persons in the community. The court therefore applies a blended hourly rate of $55 for paralegal services.

The number of hours reasonably spent on the case is problematic. Counsel maintained itemized records under three different accounts, including a billing account for the underlying bankruptcy case of Charter Graphic. In addition, counsel represented plaintiffs in a related case, *Martin F. Alonso, et al. v. Bankers Trust New York Corp., et al.,* adversary case no. 396–3159. Several of counsel's efforts pertained to both cases. Similarly, counsel rendered services for overlapping functions, such as preparation of the proofs of claim for the plaintiffs in the underlying bankruptcy case and calculation of damages in this adversary proceeding. Likewise, counsel conducted Bankruptcy Rule 2004 examinations of Gibraltar representatives in the underlying case, without Bankers Trust participation, and then participated in discovery involving Gibraltar in this adversary proceeding. Indeed, counsel also litigated against Gibraltar in this adversary proceeding and in the Alonzo adversary proceeding.

Attorney Myers analyzed counsel's time records under the three billing accounts to address these factors. She then testified about her calculations. She separated work relating to this adversary proceeding from work relating to the underlying bankruptcy case and to the Alonzo case, by assessing a percentage factor to each billing category. She then separated work pertaining to Gibraltar by assessing a percentage to counsel's efforts regarding Gibraltar. The defendants did not present an alternative assessment. The court finds that her operating percentage assessments are reasonable and applies them.

■ Nevertheless, the record of this adversary proceeding requires further refinement. The matter went to trial on a

third amended complaint. And, within that amended complaint, several causes of action had been preempted by ERISA. The parties engaged in pretrial motion litigation since the filing of the original complaint to refine the claims for relief. The defendants prevailed on several points, in that regard. The attorneys' fees award pertains to the plaintiffs' successful litigation on the ERISA issue. Consequently, the time spent on other causes of action throughout this litigation must be separated from the ERISA claim. While counsel's time devoted to contractual and tort claims may have been reasonably incurred, plaintiffs did not prevail on those claims and the award is based on the ERISA litigation. After studying the record of this adversary proceeding, the court concludes that 50% of the categories of legal research/investigation, hearings/motions, and pleadings must be attributed to the other contractual and tort claims and that 20% of written discovery and trial preparation must be similarly designated, although most would pertain to the tort claims. Furthermore, an additional 50% of the written discovery involving document production must be further attributed to work essential to have supported the filing of the proofs of claim in the bankruptcy case and therefore not appropriately recoverable as an attorney fee award for the ERISA litigation. The court also finds that one half of the time attributed to other paralegal work on trial preparation, after the 20% adjustment to focus on ERISA litigation, must be attributable to services covered by counsel's hourly rate, and not separately billable. While the court appreciates the continuing debate in the legal community about this subject, the court has not been persuaded that counsel's hourly rates should not include items such as collating, copying and organizing information by support staff.

The parties also recognized that the court must assess the amount of time reasonably spent on gathering specific information from the plaintiffs. The plaintiffs, for the most part, do not possess significant financial sophistication. Yet, on the other hand, even when timely provided to the insureds, medical insurance claims, co-pay obligations, third party administrator statements, and the like may not be easily understood or accurate. And, counsel had to deal with 70 individuals.

In other words, counsel had difficulty obtaining documentation and records of medical claims. And, as a result, counsel engaged in time-consuming and unproductive interchanges with counsel for the defendants, attempting to precisely establish the amount of each plaintiff's damages. Counsel for the defendants insisted on documentary support for these claims, even when an objective cost/benefit analysis should have resulted in a compromise or stipulated amount as the attorney fees expended arguing over exact dollar amounts exceeded the spread in claim valuation. The parties did eventually allow reason to prevail and agreed and stipulated a claim amount. Recognizing this dilemma, the court finds the amount of time reasonably devoted to individual plaintiff communication and information gathering as follows:

Counsel would have necessarily communicated with the plaintiffs to obtain sufficient information to file proofs of claims in the bankruptcy case. Given that essential communication, and considering counsel's experience, an additional hour of client communication by counsel with an additional hour of paralegal communication per client should have been sufficient for client communication regarding the ERISA claim. This assessment focuses on information needed and essential communications for the ERISA claim. That coupled with the information that would have been obtained to submit proofs of claims should have provided basic information to respond to written discovery, which the court has previously assessed. The coordination and compilation of claims material has been included by the court in its consideration of time for written discovery and client conferences and information gathering. The court's finding of the reasonable number of hours to perform those tasks should have included compilation of material into usable format. Actually, that compilation should have been rather mechanical once counsel had sufficient information for the proofs of claims. However, depositions had been required. Therefore, counsel's work defending those depositions must be awarded.

Counsel have also requested compensation for several miscellaneous categories. Several of the miscellaneous charges cover client communications which the court has already addressed. Others cover assembling docu-

ments and other items considered overhead included within counsel's hourly rate. Still others address non-billable inter-office conferences and coordination. The court finds that counsel has not established the necessity for the miscellaneous charges.

The court applies these findings to Ms. Myers' assessment and allocation of the time spent in the several categories of work. Since counsel has the burden of proof, counsel is bound by the time descriptions and summaries submitted at trial. Accordingly, the court infers that the record covers counsel time through trial.

The *Johnson* factors support the lodestar calculation. Counsel had been partially precluded from representing other clients as this matter approached trial. Counsel's law firm had to consider the effect of the representation of these plaintiffs on their clients who are employers. Counsel had a contingency fee arrangement with their clients except that if the court awarded attorneys' fees, the plaintiffs would receive their full recovery without the deduction of a contingency. Representing many financially unsophisticated clients with relatively small claims presented a difficulty for plaintiffs' counsel. For that matter, it presented frustrations for the defendants' counsel. Counsel for both sides struggled with determining the amount of each plaintiff's claim. While the dispute made little sense on a cost-benefit analysis per claim, nevertheless counsel for both sides struggled with quantifying the claims. The novelty of the issues also presented difficult legal hurdles, as evidenced by the amended complaints filed.

■ Based on this analysis, the court awards fees as follows:

| | |
|---|---|
| Pleadings | $ 2,135 |
| Hearings/motions | $ 9,723 |
| Client conference/information gathering | $ 16,100 |
| Written discovery | $ 13,650 |
| Depositions | $ 76,914 |
| Research/investigation | $ 8,440 |
| Conferences with counsel opposite | $ 1,993 |
| Settlement | $ 3,325 |
| Trial and trial preparation | $ 99,162 |
| Total lodestar award is: | $231,442 |

The court finds that Ms. Myers' allocations of expenses are reasonable and accordingly awards expenses for this matter of $64,697.99.

## COBRA

■ A plan administrator must provide certain notices required by COBRA. 29 U.S.C. § 1132(c)(1). Plan sponsors of group health plans are required to provide continuation coverage for persons who elect to have coverage after a "qualifying event." 29 U.S.C. § 1161. A "qualifying event" includes termination or reduction of hours of a covered employee's employment. 29 U.S.C. § 1163(2). The employer must notify the plan administrator of certain qualifying events, including termination of hours, within 30 days of the date of the qualifying event. 29 U.S.C. § 1166(a)(2). The plan administrator must then notify the beneficiaries of their COBRA rights. 29 U.S.C. § 1166(a)(4), (c). A plan administrator who fails to provide the notice may be personally liable to the beneficiary in an amount up to $100 per day. 29 U.S.C. § 1132(c)(1).

The debtor closed its doors on January 4, 1996. That constitutes a qualifying event. Ullman, the chief executive officer, or Villano, the chief financial officer, should have notified the plan administrator. The question becomes, who is the plan administrator?

The health plan was not written. Although certain written provisions addressing coverage and deductions or co-pay had been distributed to the employees, a comprehensive written plan does not exist. When a plan fails to designate an administrator, the plan sponsor is the administrator. The term plan sponsor means employer. 29 U.S.C. § 1002(16)(B)(i).[2] But an employer includes any person acting directly or indirectly for the employer. Here, Ullman and Villano fulfilled that role. Dworkin did not actively operate the business on a daily basis. But Ullman and Villano did.

---

2. For the 401(k) plan, Colotone, Inc., offered the debtor's employees the plan. The debtor, however, was the employer. No other plan administrator had been named. The employer acts here through its chief executive officer and its chief financial officer.

Ullman or Villano should have notified the employees or caused the employees to be notified by January 18, 1996, of their COBRA rights. Employees did not learn of their COBRA rights until Bankers Trust acted upon advice of counsel after enquiry from plaintiffs' counsel. When Bankers Trust stepped forward to provide COBRA coverage, only two plaintiffs failed to obtain coverage. Dworkin testified however that if the plaintiffs submit a claim, the claim would be paid by Bankers Trust.

Plaintiffs therefore have been or will be made whole on COBRA coverage.

### Notices

 A plan administrator must provide plan information requested by a beneficiary or participant. ERISA authorizes a $100 a day penalty for a plan administrator's failure to comply with a request for information. 29 U.S.C. § 1132(c)(1). But, as a penalty provision, § 1132 must be strictly construed. *Fisher v. Metropolitan Life Ins. Co.,* 895 F.2d 1073, 1077 (5th Cir.1990).

Individual plaintiffs did not submit a written request for plan information to any of the defendants. Counsel for the plaintiffs did however write three letters.

Plaintiffs' exhibit 2233 contains three letters written by Sharla Myers of Vial, Hamilton, Koch & Knox, L.L.P. The letter dated January 26, 1996, is addressed to Tom Villano and Gary Ullman at Colotone Imaging. The letter asks Villano and Ullman in part to

"[p]lease confirm to me [Myers] in writing . . . that Cobra benefits have been extended and that insurance coverage exists for my clients. Please also confirm that Bankers Trust and Colotone, Inc. will be responsible for payment of all medical expenses incurred by my clients which would have been covered by the health insurance for which they paid premiums."

The letter dated January 31, 1996, is addressed to Karen Grothberg at the law firm of Kirkland & Ellis. Kirkland & Ellis represented all the Bankers Trust entities in this matter. The letter states in part "I understand you have been hired by Tom Villano in order to research the obligations of Bankers Trust and/or Colotone, Inc. under ERISA

with respect to my clients . . . Mr. Villano advised me that you would let me know by Friday what your client's position on this issue is." The letter dated February 12, 1996, is also addressed to Karen Grothberg. The letter reads in part "[p]lease let me know immediately what the company intends to do about the medical bills. The information that we are receiving is, at best, confusing and, at worst, misleading."

Each letter requests information relating to benefits governed by ERISA. Each letter individually may satisfy an employee's burden of requesting information. The three letters combined notify the defendants that former employees wanted information about their benefits coverage.

Prior to January 4, 1996, the employees of Charter Graphic were not informed of the plant shut down. After the December 1995 meeting of the debtor's management, Dworkin and Gibraltar, the employees had not been informed that management was attempting to sell the company. Although not officially notified, several employees with experience in the business or previous employment recognized potential buyers during their plant tours. Neither Dworkin nor Ullman, the chief executive officer, nor Villano, the chief financial officer, informed the employees of their pending layoffs and the effect on their 401(k) plan and their health benefits. But Ullman obtained $50,000 in payments shortly before he left the company.

A disruption in health care coverage or a significant taxable event such as disruption of a 401(k) plan can have a substantial and adverse impact on people, as witnessed by attending any Chapter 13 docket before this court. The very nature of a trust imposes a duty on the fiduciary to inform the beneficiaries of material facts affecting their interest which the fiduciary knows but the beneficiary does not know. Restatement (Second) of Trusts § 173 cmt. d (1959).

The court has found that Ullman, as chief executive officer, and Villano, as chief financial officer, occupied the employer's position as the plan administrators for these plans within the meaning of ERISA. Both knew or should have known the impact on the

ERISA plans of the events of December 1995 and January 1996. As found earlier, counsel's letters reasonably requested information about the handling of medical bills. Ullman and Villano should have responded with an explanation of the effect on the plans and a description of the employees' remedies.

Both testified that they cannot envision responsibility. But corporations act through individuals. Ullman was the chief executive officer; Villano, the chief financial officer. They must be held responsible. Either could have acted to name a plan administrator other than the employer. They did not. Rather, both were the chief officers by which the employer acted in the critical time period.

A response to counsel's letter would have provided the employees with basic information, alerting them to the failure to fund the plans in December and enabling them to take some protective actions, especially with regard to pending medical expenses. Ullman and Villano should have been able to inform employees about the benefits from accumulated funds.

Villano referred plaintiffs' counsel to Kirkland & Ellis. Had the law firm provided the information, Ullman and Villano would have discharged their duties. But the law firm only addressed the COBRA issue. This case does not involve the issue of the law firm's discharge of its duties to its clients.

 The imposition of a daily penalty is discretionary. The court has already compensated the plaintiffs for their actual damages and provided recovery of their attorneys' fees and expenses. In comparison to their respective claims, a $100 penalty per plaintiff enforces the ERISA mandate. The court therefore finds that a penalty of $50 per plaintiff to be paid by Ullman and a $50 per plaintiff to be paid by Villano is the appropriate penalty.

### ERISA Ban

 The plaintiffs contend that Bankers Trust should be prohibited from performing fiduciary functions under ERISA. In this private equity venture, Bankers Trust did not act in bad faith. Bankers Trust invested in the debtor to preserve, develop, grow and hopefully prosper as a significant employer, offering employment opportunities while holding the prospect to profit on its investment. Unfortunately, Bankers Trust and its investment entities lost sight of their responsibilities to the employees in the ERISA plan when it structured and implemented the manner of the investment and the loan structure. Usually, the resulting damages to plaintiffs from this oversight would have been compensated by a priority claim dividend in the bankruptcy case of their employer. But that did not happen. Nevertheless, the judgment resulting from these findings of fact and conclusions of law compensates the plaintiffs for their damages suffered by this oversight. Bankers Trust is not prohibited from performing fiduciary functions under ERISA as the judgment should be a sufficient reminder to institutions and individuals to structure investment and loan transactions mindful of fiduciary obligations to employee benefit plans.

### Conclusion and Orders

Bankers Trust New York Corporation, Bankers Trust Capital Partners, Inc., Sphinx Graphic Ventures, Inc., Pyramid Ventures, Inc., Gary Ullman and Tom Villano are all liable for the breach of fiduciary duty under ERISA as each directly or as a conduit or agent for its parent corporation, acting through their agent James Dworkin, exercised control over employee benefit plan assets, or were plan administrators, as found in this memorandum opinion. The plaintiffs shall have a judgment against them for the damages found in this opinion. The plaintiffs' shall recover the attorneys' fees and expenses awarded in this opinion from the Bankers Trust entities. The plaintiffs shall recover pre-judgment interest from the date of the filing of the third amended complaint. In addition, each plaintiff shall recover a judgment of $50 from Gary Ullman and $50 from Tom Villano for failure to provide requested information. No penalty is assessed on the COBRA issue. Bankers Trust shall not be prohibited from acting as an ERISA fiduciary.

**SO ORDERED.**

Counsel for the plaintiffs shall prepare a final judgment consistent with these findings of fact and conclusions of law.

However, if the parties do not consent to the entry of a final judgment by this court, 28 U.S.C. § 157(c), then

**IT IS ORDERED** that the above memorandum opinion and order shall be the court's proposed findings of fact and conclusions of law required by Bankruptcy Rule 9033(a). The clerk of court shall serve copies of this memorandum opinion and order pursuant to Rule 9033(a).

**IT IS FURTHER ORDERED** that within 10 days after being served with a copy of this memorandum opinion and order, a party may serve and file with the clerk written objections pursuant to Bankruptcy Rule 9033(b). In the absence of a timely filed objection pursuant to Rule 9033(b), counsel for the plaintiffs shall submit a final judgment to the court for entry.

Michael Lowenberg
G. Michael Curran
David F. Staber
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201-4618
(214) 969-2800, Fax (214) 969-4343

ATTORNEYS FOR DEFENDANTS BANKERS TRUST NEW YORK CORPORATION,
BT CAPITAL PARTNERS, INC., SPHINX GRAPHIC VENTURES, INC.,
PYRAMID VENTURES, INC., AND JAMES M. DWORKIN

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 96-30620-SAF-11 |
| | § | |
| CHARTER GRAPHIC SERVICES, INC. | § | (CHAPTER 11) |
| f/k/a COLOTONE RIVERSIDE, INC. | § | |
| d/b/a CHARTER PRESS, | § | |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| JESSE C. BANNISTOR, et al, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADVERSARY NO. 396-3362 |
| | § | |
| COLOTONE, INC., et al., | § | |
| Defendants. | § | |

## ADDITIONAL STIPULATION OF PARTIES

NOW COMES Bankers Trust New York Corporation, BT Capital Partners, Inc., Sphinx

Graphic Ventures, Inc., Pyramid Ventures, Inc. and James Dworkin (the "BT Defendants") and

files this Additional Stipulation of Parties.

1. The Plaintiffs were employees of Colotone Riverside, Inc.

2. Colotone-Riverside, Inc. was engaged in interstate commerce.

ADDITIONAL STIPULATION OF PARTIES - Page 1

3. A plan or program for the employees of Colotone Riverside, Inc. was established for the purpose of providing its participants or beneficiaries medical, surgical or hospital care or benefits (the "Health Plan").

4. A 401(k) Plan was established or maintained for the benefit of the employees of Colotone Riverside, Inc.

5. The above-captioned litigation relates to the Health Plan and the 401(k) Plan.

6. The Plaintiffs listed on Exhibit "B" were participants in the 401(k) Plan and the Plaintiffs listed in paragraphs 9 - 14 below were participants in the Health Plan.

7. The column labeled "MTD 401(k)" on Exhibit "B" reflects the amounts shown as withheld on the employee paychecks for 401(k) contributions which were not deposited in the trust for the 401(k) plan.

8. On May 3, 1996, Michael Talkington was mailed the COBRA notice designated as Defendants' Exhibit "A" at his correct home address.

9. The following Plaintiffs have unpaid health insurance claims under the health plan provided by Colotone Riverside, Inc., in the amounts set forth by each name:

| | |
|---|---|
| Martin Alonso | $12,147.24 |
| Karl Bradford | $6,455.47 |
| Alfredo Chavez | $300.00 |
| Alton Clingon | $368.80 |
| Jack Cohea | $11,510.87 |
| Gary Cravens | $1,306.23 |
| Todd Donahoo | $329.25 |
| Joseph Donaldson | $20,000.00 |
| Mark Eckerle | $1,012.74 |
| Earl Estey | $428.73 |
| Scott Finkelstein | $11,717.50 |
| Wilson Foster | $196.00 |
| David Houdek | $668.00 |
| Lonnie Jarrett | $747.20 |
| Kent Justiss | $109.00 |
| Bruce Kwass | $250.00 |

ADDITIONAL STIPULATION OF PARTIES - Page 2

| | |
|---|---|
| Lynette Lewis | $214.05 |
| Fred Middleton | $56.00 |
| Carl Murphy | $1,616.40 |
| Marjorie Pannell | $885.19 |
| Paul Perry | $247.00 |
| Henry Pomykal | $682.68 |
| Marvin Saldeen | $500.73 |
| Andrew Schilling | $986.22 |
| Gwen Sharb | $240.00 |
| Letris Stewart | $271.00 |
| Jefferey Stinson | $415.00 |
| Michael Talkington | $518.35 |
| Johnnie I. Thompson | $840.00 |
| Lora Sue Thompson | $15,550.11 |
| Brian Turner | $8,882.46 |
| Jimmy Williams | $886.50 |
| *Michael Hicks* | *$10,938.60* |

10. Catherine Fiser has unpaid medical claims of $6,695.55, of which $4,324.97 were *She was on COBRA prior to January 4, 1996,* incurred after January 4, 1996.

11. Lori Jungman has unpaid medical claims of $417.00, of which $52.00 was incurred on January 3, 1996. Lori Jungman did not have any health insurance premiums withheld from her paycheck in January, 1996.

12. Lee Perry has unpaid medical claims of $1,923.50. Lee Perry has an additional unpaid health claim dated January 11, 1996 in the amount of $322.80.

13. Bobby Powell has unpaid medical claims of $1,035.28, of which $410.00 was incurred on January 31, 1996. Bobby Powell has also submitted these claims for payment under the Workers Compensation Policy, *but they have not been paid.*

14. Jeff Humphrey has unpaid medical claims of $1,070.35, of which $656.00 was incurred after January 11, 1996.

ADDITIONAL STIPULATION OF PARTIES - Page 3

Respectfully submitted,

By: _____

Michael Lowenberg, P.C.
State Bar No. 12630000
G. Michael Curran
State Bar No. 05259600
David F. Staber
State Bar No. 18986950

AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
214/969-2800
FAX: 214/969-4343

ATTORNEYS FOR DEFENDANTS BANKERS
TRUST NEW YORK CORPORATION, BT
CAPITAL PARTNERS, INC., SPHINX GRAPHIC
VENTURES, INC., PYRAMID VENTURES, INC.
AND JAMES DWORKIN

_____

Bruce Bowman
Vial Hamilton Koch & Knox, L.L.P.
1717 Main Street
Dallas, Texas 75201

ATTORNEYS FOR THE PLAINTIFFS

_____

John Leslie
3838 Oak Lawn Avenue, Suite 1800
Dallas, Texas 75219-4575

ATTORNEY FOR GARY ULLMAN AND
TOM VILLANO

782

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the above and foregoing instrument has been served on the following parties by U.S. First Class Mail, postage prepaid, this _____ day of February, 1998:

Bruce Bowman
Vial, Hamilton, Koch & Knox
1717 Main Street, Suite 4400
Dallas, TX 75201

John E. Leslie
3838 Oak Lawn Ave., Suite 1800
Dallas, TX 75219

_____
David F. Staber

#86502

# EXHIBIT B

401K FOR NOVEMBER, 1995

Date: 11/29/1995

| LAST NAME | FIRST NAME | SOCIAL SECURITY NO. | MTD GROSS | MTD .401K | YTD DA |
|---|---|---|---|---|---|
| ALONSO | MARTIN F | | 4705.77 | | |
| BANNISTER | J C | | 8744.78 | 472.13 | |
| BENBERRY | LARRY A | | 3939.36 | 275.76 | |
| BERMAN | PETER P | | 6000.00 | | |
| BREWER | WILLIAM J | | 3339.40 | 233.76 | |
| BROWN | WILLIAM C. | | 7606.06 | 380.31 | |
| BRUMMETT | MICHAEL E. | | 3876.14 | | |
| BRUNER | JANET A | | 6330.79 | 106.62 | |
| CHAVARRIA | ALBERT | | 3946.85 | 157.88 | |
| COHEA | JACK D | | 3773.03 | 301.84 | |
| CRAVENS | GARY L | | 6807.72 | 440.36 | |
| CRISP | RANDY E | | 4221.69 | 126.66 | |
| DOMINGUEZ | ANA L | | 1990.51 | | |
| DONAHOO | TODD S | | 6983.66 | 349.18 | |
| ECHEVERRIA | DOLORES H | | 1953.52 | | |
| ECKERLE | MARC | | 4730.79 | | |
| EDDLEMAN | LINDA R. | | 4960.00 | 99.00 | |
| ESTEY | E RICHARD | | 4407.48 | 440.75 | |

VH 000557

| | | | |
|---|---|---|---|
| FISER | CATHERINE | 4012.60 | 60.60 | 11/03/95 |
| FRANCIS | CHARLES R | 5074.47 | | |
| GARGUS | JAMES E | 5579.24 | 857.93 | |
| .HARDING | PETER | 7815.41 | 350.76 |
| HASTINGS | ROBERT E | 3787.88 | 265.64 |
| HICKS | MICHAEL M | 15547.93 | 777.41 |
| HOLMES | STEPHEN B | 4823.10 | 144.69 |
| HOUDEK | DAVID J | 4573.60 | 45.74 |
| HUMPHREY | JEFF L | 4981.10 | |
| JARRETT | LONNIE L | 5513.17 | 165.40 |
| JARRETT | ROGER W | 2709.29 | |
| JUNGMAN | LORI M | 2548.15 | 127.41 |
| JUSTISS | KENT A | 4730.85 | 236.55 |
| KISLER JR | ROBERT G | 21206.78 | 2262.22 |
| KWASS | BRUCE W | 27317.88 | 700.00 |
| LEWIS | LYNETTE | 4815.38 | 135.45 |
| MANGRUM | FLORENCE M | 3007.27 | 150.36 |
| MIDDLETON | FRED C | 7019.24 | 350.66 |

VH 000558

| | | | |
|---|---|---|---|
| PANNELL | MARJORIE | 3607.69 | 190.38 |
| PEARCE | WILLIAM W | 4432.47 | 221.63 |
| PERRY | LEE A | 6155.35 | 492.43 |
| PERRY | PAUL R. | 4169.34 | 332.75 |
| PHILLIPS | DAVID V | 4569.24 | 137.07 |
| POMYKAL | HENRY E | 4126.76 | 206.44 |
| POWELL | BOBBY | 3361.73 | 507.26 |
| ROSALES | JOHN PAUL | 5538.48 | |
| SALDEEN | MARVIN E | 4325.94 | 432.60 |
| SALINAS | ALEJANDRO | 5296.60 | 263.33 |
| SANCHEZ | MARY A | 2561.06 | 133.05 |
| SCHILLING | ANDREW C | 3900.88 | 585.09 |
| RECKER | HAROLD W | 5524.62 | 828.69 |
| SHARB | GWEN R. | 5312.48 | 159.38 |
| SIMMONDS | BOBBY D | 4705.20 | 186.21 |
| SMITH | HOWARD K. | 4245.36 | |
| STANLEY | SHANNON R. | 2529.09 | |
| STEWART | LETRIS I | 2701.39 | 135.07 |
| STINSON | STEVE | 4457.44 | |
| STOKER | HARVEY | 524.00 | 11/01/95 |
| TALKINGTON | MICHAEL T | 6707.61 | 670.60 |
| TARRANT | CLAUDETTE | 3019.48 | 452.76 |
| THOMAS | EDDIE | 3447.08 | |

VH 000559

| | | | |
|---|---|---|---|
| VILLARREAL | SAMUEL | 6579.72 | 328.39 |
| WALLACE | JOHN H | 4511.20 | |
| WALTON | JACKIE B | 4509.63 | 356.67 |
| | | 17307.72 | |
| WILLIAMS | MICHAEL P. | 2194.64 | 219.48 |
| WILSON | JOHN W | 3717.19 | 185.85 |
| WINN | MICHAEL M | 6692.31 | |
| ZUMBRUN | JAMES M | 4501.37 | 180.08 |
| SUB-TOTAL | | 1023905.54 | 36043.41 |

VH 000560

■■■■■■■■■■

401K FOR DECEMBER, 1995

Date: 12/27/1995

| LAST NAME | FIRST NAME | SOCIAL SECURITY NO. | MTD GROSS | MTD 401K | TERM DATE |
|---|---|---|---|---|---|
| ALONSO | MARTIN F | | 3888.48 | | |
| BANNISTER | J C | | 5182.54 | 353.48 | |
| BENBERRY | LARRY A | | 2882.99 | 201.81 | |
| BERMAN | PETER P | | 3500.00 | | |
| BRADFORD | KARL A | | 3339.86 | | |
| BREWER | WILLIAM J | | 2244.49 | 157.12 | |
| BROWN | WILLIAM C. | | 5178.84 | 258.83 | |
| BRUMMETT | MICHAEL E. | | 2934.63 | | |
| BRUNER | JANET A | | 3553.83 | 71.08 | |
| CHAVARRIA | ALBERT | | 3073.24 | 122.93 | |
| COSTA | JOSEPH W | | 25003.16 | | |
| CRAVENS | GARY L | | 6038.48 | 301.92 | |
| CRISP | RANDY E | | 2747.36 | 82.42 | |
| DOMINGUEZ | ANA L. | | 786.94 | | |
| DONAHOO | TODD S | | 3385.13 | 169.26 | |
| ECHEVERRIA | DOLORES H. | | 1233.15 | | |
| ECKERLE | MARC | | 3163.88 | | |
| EDDLEMAN | LINDA R. | | 3300.00 | 66.00 | |
| ESTEY | E RICHARD | | 2813.97 | 281.40 | |
| FINKELSTEIN | SCOTT M. | | 2792.32 | | |
| FRANCIS | CHARLES R | | 2865.54 | | |
| GARGUS | JAMES E | | 5955.16 | 566.62 | |

VH 000561

788

Date: 12/27/1995

| LAST NAME | FIRST NAME | SOCIAL SECURITY NO. | MTD GROSS | MTD 401K | TERM DATE |
|-----------|-----------|---------------------|-----------|----------|-----------|
| HARDING | PETER | | 12264.01 | 613.19 | |
| HASTINGS | ROBERT E | | 2448.14 | 171.23 | |
| HICKS | MICHAEL M | | 4965.40 | 248.28 | |
| HOLMES | STEPHEN B | | 3215.40 | 96.46 | |
| HOUDEK | DAVID J | | 2773.88 | 27.74 | |
| HUMPHREY | JEFF L | | 3065.04 | | |
| | | | | .54 | |
| JARRETT | LONNIE L | | 4471.07 | 134.13 | |
| JARRETT | ROGER W | | 1846.79 | | |
| JUNGMAN | LORI M | | 1933.50 | 96.17 | |
| JUSTISS | KENT A | | 3153.90 | 157.70 | |
| KISLER JR | ROBERT G | | 3825.98 | | |
| KWASS | BRUCE W | | 25812.79 | 700.00 | |
| LEWIS | LYNETTE | | 3076.92 | 92.30 | |
| MANGRUM | FLORENCE M | | 1858.61 | | |
| MIDDLETON | FRED C | | 5000.00 | 260.00 | |
| MURPHY | CARL L | | 2412.44 | 48.25 | |
| PANNELL | MARJORIE L | | 2538.48 | 126.92 | |

VH 000562

Date: 12/27/1995

| LAST NAME | FIRST NAME | SOCIAL SECURITY NO. | MTD GROSS | MTD 401K | TERM DATE |
|---|---|---|---|---|---|
| PEARCE | WILLIAM W | | 2738.59 | 136.83 | |
| PERRY | LEE A | | 3964.75 | 317.18 | |
| PERRY | PAUL R. | | 2765.62 | 221.25 | |
| PHILLIPS | DAVID V | | 3046.16 | 91.38 | |
| POMYKAL | HENRY E | | 2827.62 | 141.38 | |
| POWELL | BOBBY | | | 132.31 | |
| ROSALES | JOHN PAUL | | 3592.32 | | |
| SALDEEN | MARVIN E | | 2755.14 | 278.51 | |
| SALINAS | ALEJANDRO | | 3377.40 | 168.87 | |
| SANCHEZ | JOANN | | 1093.10 | | |
| SANCHEZ | MARY A | | 1631.49 | 81.57 | |
| SCHILLING | ANDREW C | | 3170.78 | 475.62 | |
| SECKER | HAROLD W | | 3683.08 | 552.46 | |
| SHARB | GWEN R. | | 3658.22 | 109.74 | |
| SIMMONDS | BOBBY D | | 2683.35 | 107.34 | |
| SMITH | HOWARD K. | | 3226.50 | | |
| STANLEY | SHANNON R. | | 1629.20 | | |
| STEWART | LETRIS I | | 1676.42 | 83.82 | |
| STINSON | STEVE | | 3084.23 | | |
| TALKINGTON | MICHAEL T | | 5237.40 | 623.75 | |
| TARRANT | CLAUDETTE | | 1865.95 | 233.39 | |
| THOMAS | EDDIE | | 2479.55 | | |
| TORRES | JOE R | | 2822.53 | 209.80 | |
| TURNER | BRIAN S | | 3513.24 | 175.68 | |
| VILLARREAL | SAMUEL | | 3433.31 | | |
| WALLACE | JOHN H | | 5050.08 | 353.51 | |
| WALTON | JACKIE S | | 11536.43 | | |

VH 000563

Date: 12/27/1995

| LAST NAME | FIRST NAME | SOCIAL SECURITY NO. | MTD GROSS | MTD 401K | TERM DATE |
|-----------|-----------|---------------------|-----------|----------|-----------|
| WILLIAMS | MICHAEL P. | | 3103.60 | 310.36 | |
| WILSON | JOHN W | | 2305.12 | 115.26 | |
| WINN | MICHAEL M | | 4461.54 | | |
| ZUMBRUN | JAMES M | | 3111.49 | 124.46 | |

VH 000564

## ADDITIONS TO EXHIBIT "B"

| NAME | AMOUNT OF 401(k) CLAIM |
| --- | --- |
| Alton Clingan | $557.04 |
| Joseph Donaldson | $200.00 |
| Catherine Fiser | $60.80 |
| Wilson Foster | $475.00 |
| Van Doyle Mann | $469.56 |
| William Marble | $270.00 |
| James McDougal | $531.89 |
| Kenneth Munger | $1,064.31 |
| Johnnie Thompson | $120.00 |
| Jimmy Williams | $223.06 |

J:\LIT\SHM\FORMS\188585.1